Alfred ALBRECHT, Sr.

v.

Martin HORN, Commissioner,
Pennsylvania Department
of Corrections

No. CIV.A.99–1479.

United States District Court,
E.D. Pennsylvania.

April 21, 2004.

Billy H. Nolas, Robert Brett Dunham, Stuart B. Lev, Matthew C. Lawry, Philadelphia, PA, Charles Theodore Fritsch, Jr., Langhorne, PA, for Petitioner.

Colin David Dougherty, Conshohocken, PA, Heather A. Castellino, District Attorney's Office, Michele Kelly, Office of District Attorney Bucks City, Doylestown, PA, for Respondent.

### *MEMORANDUM AND ORDER*

KAUFFMAN, District Judge.

Before the Court is the Petition of Alfred Albrecht, Sr. ("Petitioner") for a Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254. For the reasons set forth below, the Petition will be granted with respect to Petitioner's sentence and denied with respect to his underlying conviction.[1]

## I. *Background*

On August 8, 1980, Petitioner was convicted by a jury of one count of first degree murder, two counts of second de-

---

1. Petitioner was sentenced to death on a first degree murder conviction, two life sentences on second degree murder convictions, and ten to twenty years on arson convictions, each sentence to run consecutive to the others.

gree murder, and four counts of arson for the killing of his wife, his mother, and his daughter in a fire at the family's home. Answer to Petition for Writ of Habeas Corpus ("Answer") at 8. On May 2, 1983, in accordance with the jury's recommendation, Petitioner was sentenced to death.

At trial, the Commonwealth established that on May 1, 1979, at approximately 6:26 a.m., local fire departments responded to a residential fire at Petitioner's home in Perkasie, Bucks County. Answer at 1. When the fire was extinguished, they entered the house and found the bodies of Petitioner's wife, mother and daughter, who had died from the combined effect of the heat, gases, and lack of oxygen. *Commonwealth v. Albrecht*, 510 Pa. 603, 511 A.2d 764, 766 (1986) ("*Albrecht I*"); Answer at 1, *citing* Trial Transcript ("T.T." 7/29/80, pp. 6–19). Petitioner's son survived by jumping out of a second story window. Answer at 1, *citing* T.T.s 7/22/80, 7/30/80.

Where Petitioner was when the fire started is disputed. Petitioner avers that he was in bed. This contention is supported by the testimony of his son, who said that he heard his father get out of bed after the fire had started. Petitioner's Post–Hearing Memorandum of Law, Exhibit 1, at 37. Petitioner is a smoker and claims that he inadvertently left a lit cigarette on the chair in the living room. *Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693, 707 (1998) ("*Albrecht II*"). Petitioner claims that he awoke smelling smoke and walked out of his first floor bedroom and into the living room, where he observed the raging fire. He then fled the house immediately and only when outside realized that his family was trapped inside. Petitioner was advised by a neighbor, a fireman, not to re-enter the house. Petitioner's Post–Hearing Memorandum, Ex. 1, at 50.

The Commonwealth, however, asserts that Petitioner started the fire in the kitchen, using gasoline as an accelerant. Answer at 15–16, *citing* T.T.s 7/23/80, 7/24/80, 7/25/80. According to Commonwealth fire experts, the presence of petroleum distillates in the wood under the kitchen floor, the presence of lead on various objects found at the scene, the presence of gasoline in the ceiling tiles, and the "blistering" and burn patterns found in the wood in the living room and kitchen demonstrated that the fire could not have been accidental and that a liquid accelerant (gasoline) was used to start the fire. Answer at 2, *citing* T.T.s 7/28/80, 7/31/80.

When police searched Petitioner's car, they found an empty gas can with Petitioner's fingerprints and soot on it. Answer at 2, *citing* T.T.s 7/24/80, 7/28/80. The soot was determined to contain gasoline. Answer at 3, *citing* T.T. 7/31/80. A local gas station employee testified that Petitioner had attempted to purchase gasoline for that can on the afternoon before the fire. Answer at 3, *citing* T.T. 7/31/80.

The Commonwealth also introduced evidence that Petitioner abused his wife physically and emotionally and that he had threatened to harm her in the weeks before her death. *Albrecht I*, 511 A.2d at 766–768. This evidence included testimony from his wife's attorney about Petitioner's alleged violation of a December 1978 Protection from Abuse Act order. *Id.*, 511 A.2d at 767. It also included testimony from neighbors and friends who observed the physical manifestations of abuse, including bruises, missing clumps of hair, and cigarette burns on Petitioner's wife in the months preceding her death. *Id.*; Answer at 3–6. Neighbors further testified about a particular incident when Petitioner's wife took refuge from Petitioner at their house. *Albrecht I*, 511 A.2d at 767. The Commonwealth also offered testimony that Petitioner had at least one extramarital affair. *Id.* at 766; *Albrecht II*, 720 A.2d at 702.

The evidence at trial revealed that this pattern of abuse continued through the night before the fire, when Petitioner's son ran to the neighbors' house and related that his father was abusing his mother and threatening to burn the house down. *Albrecht II*, 720 A.2d at 704–705; Answer at 6, *citing* T.T. 7/30/80. The police were called and, upon investigation, found evidence of a recent fight. *Albrecht I*, 511 A.2d at 768; Answer at 6, *citing* T.T. 7/31/80. When questioned, Petitioner's wife told the police that he had threatened to burn her dress. *Albrecht I*, 511 A.2d at 768. Petitioner eventually demanded that the police leave. Answer at 6, *citing* T.T. 7/31/80.

The Commonwealth also introduced evidence regarding prior threats by Petitioner to burn down his house or to severely injure his wife. *Albrecht I*, 511 A.2d at 768. Finally, the Commonwealth introduced evidence that Petitioner showed little remorse following the fire and the deaths of his wife, mother and daughter. Answer at 6, *citing* T.T. 7/29/80.

On June 23, 1986, the Pennsylvania Supreme Court affirmed Petitioner's convic-tion and death sentence on direct appeal. *Albrecht I*, 511 A.2d at 764. The United States Supreme Court declined to issue a writ of certiorari on March 30, 1987. *Albrecht v. Pennsylvania*, 480 U.S. 951, 107 S.Ct. 1617, 94 L.Ed.2d 801 (1987).

Thereafter, Petitioner filed a *pro se* petition for post-conviction relief ("PCRA petition"). *Commonwealth v. Albrecht*, B.C.C.C. No.1980–00408 (docket sheet). On July 13, 1991, Petitioner, by appointed counsel, filed an amended PCRA petition seeking discovery, funds for investigation and expert witnesses, and an evidentiary hearing. *Commonwealth v. Albrecht*, B.C.C.C. No.1980–00408 (docket sheet). Petitioner's request for funds was denied, and the Pennsylvania Supreme Court denied his Petition for Extraordinary Review. Petition for Writ of Habeas Corpus ("Petition") at ¶4. Petitioner's amended PCRA petition was dismissed on January 24, 1996. Petition at ¶8. He appealed, and the Pennsylvania Supreme Court affirmed on November 23, 1998. *Albrecht II*, 720 A.2d at 710.

On March 24, 1999, Petitioner filed the present Petition for Writ of Habeas Corpus, alleging fourteen grounds for relief.[2]

2. Petitioner asserts the following grounds for relief:

1. His convictions and death sentence violate the Eighth and Fourteenth Amendments to the Constitution because he is actually innocent. Petition at Count I.

2. He was deprived of his right to a meaningful appeal in violation of his rights to due process and equal protection because the jury voir dire and portions of the trial were not transcribed. Petition at Count II.

3. His rights under the Sixth, Eighth and Fourteenth Amendments were violated by the selection of the jury pool. Petition at Count III.

4. His rights to due process, to testify in his own defense, and to the effective assistance of counsel were violated by improper impeachment of his witnesses. Petition at Count IV.

5. His right to due process was violated by the trial court's failure to give a limiting instruction to the jury in connection with evidence of his prior bad acts. Petition at Count V.

6. His rights under the Sixth, Eighth and Fourteenth Amendments were violated by the admission of prejudicial, inadmissible hearsay. Petition at Count VI.

7. He was denied his constitutional right to effective assistance of counsel at trial when he was instructed not to speak with counsel while on breaks immediately preceding and during his cross-examination. Petition at Count VII.

8. He was denied his constitutional right to effective assistance of counsel at trial and sentencing when counsel failed adequately to investigate the mental and physical impairments which might have rendered him incompetent to be tried

On April 28, 1999, this Court issued an Order staying Petitioner's execution until further order of Court.

## II. Waiver and Procedural Bar

The parties agree that Counts III, IV, XI, XII, and part of Count I [3] were addressed by the Pennsylvania Supreme Court on the merits and thus not waived by Petitioner. However, Respondent avers that Petitioner's claims in Counts II, V, VI, VII, VIII, IX, and X were waived at the state level and are therefore procedurally barred from review by this Court. Because the Supreme Court of Pennsylvania changed its long-standing practice of "relaxed waiver" on Petitioner's PCRA appeal, this Petition presents unique issues of waiver and procedural bar.

Respondent argues that Counts II, V, VI, VII, VIII, IX, and X were reviewed by the Pennsylvania Supreme Court and were found to have been waived by the failure to raise them, either on direct appeal or on PCRA review.[4] It is not clear the extent to which Counts XIII, XIV, and the remainder of Count I were presented to the Pennsylvania Supreme Court, but the Supreme Court did not consider them either on direct appeal or on PCRA review.

The Pennsylvania Supreme Court concluded that the group of claims asserted in Counts II, V, VI, VII, VIII, IX, and X had been waived. Normally, unless Petitioner could show cause for and prejudice from his default at the state level, federal habeas review would be precluded. *Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Doctor v. Walters,* 96 F.3d 675 (3d Cir.1996). Petitioner urges the Court not to treat any of the claims he raised at any level of direct or PCRA appeal as defaulted. He notes that from 1978 until the decision in his PCRA appeal, the Supreme Court of Pennsylvania recognized a "duty to transcend procedural rules" in capital cases. *Commonwealth v. McKenna,* 476 Pa. 428, 383 A.2d

---

or to testify in his own defense. Petition at Count VIII.

9. He was denied his constitutional right to effective assistance of counsel at sentencing by counsel's failure to present mitigating evidence of mental and physical impairments and of his difficult life history. Petition at Count IX.

10. He was denied his Eighth Amendment rights by the prosecutor's improper arguments during the closing of the sentencing phase and was denied his Sixth Amendment rights by his counsel's failure to object. Petition at Count X.

11. His Eighth Amendment rights were violated by the capital sentencing phase jury instructions. Petition at Count XI.

12. His right to due process and his Eighth and Fourteenth Amendment rights to meaningful appellate review of his capital case were violated by the arbitrary review of the proportionality of his death sentence performed by the Pennsylvania Supreme Court. Petition at Count XII.

13. He was denied his constitutional right to effective assistance of counsel at trial and on appeal by the failure of counsel to raise those errors alleged in Counts I–XII. Petition at Count XIII.

14. He is entitled to a new trial and sentencing proceeding because the cumulative effect of the trial errors undermine confidence in the verdict. Petition at Count XIV.

Because the Court finds that the allegations in Count XI require that Petitioner's sentence be vacated, it need not reach the claims raised in Counts IX, X, XII or the sentence-related aspects of Counts VIII, XIII, and XIV.

3. The "issue specifically of whether petitioner's due process rights were violated by the Court of Common Pleas denial of additional time and funds at the PCRA level... was addressed on the merits by the Pennsylvania Supreme Court." Answer at 12.

4. Contrary to Respondent's assertions, the Pennsylvania Supreme Court addressed the claims in Count VI on the merits. *See infra,* pp. 472–75.

174, 181 (1978). This perceived duty led to the doctrine of "relaxed waiver" in death penalty cases, which amounted to a "practice of reaching the merits of claims in PCRA petitions in capital cases regardless of the failure of the petition to meet the appropriate procedural criteria." *Banks v. Horn*, 126 F.3d 206, 214 (3d Cir.1997). The Court often heard arguments that had not been raised in any of the lower court proceedings, or that were raised at one level, but not at all required levels. *Jacobs v. Horn*, 129 F.Supp.2d 390, 398 (M.D.Pa.2001).

This practice changed in 1998, when the Supreme Court issued its decision *in this case* on Petitioner's PCRA appeal. *Albrecht II*, 720 A.2d at 700 ("While it has been our 'practice' to decline to apply ordinary waiver principles in capital cases, we will no longer do so in PCRA appeals.") (internal citations omitted). The Supreme Court found that Petitioner had waived a number of potential arguments by not raising them earlier. These claims were not addressed on the merits, but instead were dismissed on procedural grounds. Accordingly, the first question before this Court is whether the Pennsylvania Supreme Court's decision to dismiss those claims renders them immune to examination on federal habeas corpus.

■ Normally, out of concern for federalism and comity, a District Court will not hear argument on issues raised in a habeas petition that were procedurally defaulted at the state level. *Lambrix v. Singletary*, 520 U.S. 518, 523, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997); *Bronshtein v. Horn*, 2001 WL 767593, *4 (E.D.Pa.2001). "[A] habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance.... The independent and adequate state ground doctrine ensures that the States'

interest in correcting their own mistakes is respected in all federal habeas cases." *Coleman*, 501 U.S. at 732, 111 S.Ct. 2546 (1991). This doctrine applies equally to procedural and substantive matters, meaning that it prevents federal courts from hearing the merits of cases where the petitioner failed to comply with a state procedural rule. *Bronshtein*, 2001 WL 767593 at *4, *citing Wainwright v. Sykes*, 433 U.S. 72, 82, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

■ Nonetheless, a habeas court will review questions of federal law decided by state courts so long as the state's decision does not rest on independent and adequate state grounds. *Szuchon v. Lehman*, 273 F.3d 299, 325 (3d Cir.2001) ("A habeas court 'will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment' "), *quoting Coleman*, 501 U.S. at 729, 111 S.Ct. 2546. Here, the Pennsylvania Supreme Court rested its decisions upon Pennsylvania law. *Albrecht II*, 720 A.2d at 700, *citing* 42 Pa. Cons.Stat. § 9543(a)(3); *see generally Szuchon*, 273 F.3d at 325; *Bronshtein*, 2001 WL 767593, at *4.

■ However, a careful review of the facts demonstrates that the procedural grounds upon which the Pennsylvania Supreme Court relied are not adequate. "A procedural rule is adequate only if it is firmly established, readily ascertainable, and regularly followed." *Szuchon*, 273 F.3d at 325, *citing Ford v. Georgia*, 498 U.S. 411, 423–24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991); *Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). This standard is met where "(1) the state procedural rule speaks in unmistakable terms; (2) all appellate courts refused to review the petitioner's claims on the merits; and (3) the state

courts' refusal in this instance is consistent with other decisions." *Doctor v. Walters*, 96 F.3d at 683–84. *See also Dugger v. Adams*, 489 U.S. 401, 410 n. 6, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989) (a state must demonstrate that in the "vast majority of cases" the rule is applied in a "consistent and regular" manner); *Hathorn v. Lovorn*, 457 U.S. 255, 263, 102 S.Ct. 2421, 72 L.Ed.2d 824 (1982) (a state rule should be applied "evenhandedly to all similar claims"). The first two conditions are clearly met in this case. The state rule speaks in absolute terms and the Pennsylvania Supreme Court denied the petition on the grounds of procedural bar, which is considered a determination on the merits. *See Harris v. Reed*, 489 U.S. at 261–63, 109 S.Ct. 1038.[5]

However, "[t]he Court of Appeals for the Third Circuit has [held] that the relevant moment for determining the adequacy of a state rule is 'not ... when the [Pennsylvania court] relied on it, but rather ... the date of the waiver that allegedly occurred." *Bronshtein*, 2001 WL 767593 at *5, *quoting Doctor*, 96 F.3d at 684. *See also Reynolds v. Ellingsworth*, 843 F.2d 712, 725 (3d Cir.1988) ("procedural default is determined by the waiver law in effect at the time of the asserted waiver") (internal quotations omitted). Thus, in cases where the waiver upon which the Pennsylvania Supreme Court based its decision predated the decision in *Albrecht II,* that Court's decision is not adequate to establish a procedural bar to federal examination of those claims on habeas review. *Szuchon*, 273 F.3d at 327 ("[S]uch a precedent setting use of a procedural bar indicates that the bar was not firmly estab-

lished, readily ascertainable, and regularly followed at the time of the purported defaults."). Because Petitioner's was the first capital case since 1978 in which the Supreme Court enforced the PCRA waiver rules, it follows that the Supreme Court's consistent application of the PCRA waiver rules did not begin until after Petitioner had waived his arguments. Accordingly, this Court is not barred from considering Petitioner's claims on the merits despite the Pennsylvania Supreme Court's finding that they were procedurally waived.[6]

Thus, the Court will address Counts II, V, VI, VII, VIII, IX, and X on the merits. Because there is no decision of the Pennsylvania Supreme Court to which this court must defer for legal conclusions, the Court will review these claims *de novo. Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001).

■ In Count I, Petitioner complains both that he is actually innocent and that the Pennsylvania courts wrongly denied him access to the funds necessary to hire an expert to prove this contention. The Commonwealth argues that the substantive aspect of Count I, that Petitioner is actually innocent, was waived, and that only Petitioner's claim that he should have been given funds to hire an expert was addressed on the merits by the Pennsylvania Supreme Court. However, the Court finds that no waiver occurred. Petitioner brought before the Pennsylvania Supreme Court the limited issue of whether he was improperly denied funds to retain a fire expert. Generally, this would operate as a waiver to the broader claim of actual inno-

5. 42 Pa. Cons.Stat. § 9543 states: (a) General rule.—To be eligible for relief under this subchapter, the petitioner must plead and prove by a preponderance of the evidence all of the following: ...

(3) That the allegation of error has not been previously litigated or waived.

6. This decision is in accord with numerous other cases in the Third Circuit that have addressed this issue. *See, e.g. Doctor*, 96 F.3d 675; *Bronshtein*, 2001 WL 767593; *Jacobs*, 129 F.Supp.2d 390; *Pursell v. Horn*, 187 F.Supp.2d 260 (W.D.Pa.2002).

cence, as a Petitioner must fairly present his claims to the highest state court for its review. *Whitney v. Horn*, 280 F.3d 240, 250 (3d Cir.2002), *citing O'Sullivan v. Boerckel*, 526 U.S. 838, 842, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). However, the procedural bar will not be enforced where Petitioner can demonstrate cause and prejudice. *Coleman*, 501 U.S. at 750, 111 S.Ct. 2546 ("In all cases in which a state prisoner has defaulted his federal claims in state court... federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice"). Here, Petitioner could not reasonably prove his case without expert testimony. Thus, by refusing Petitioner the funds to hire such an expert, the Pennsylvania courts prevented him from substantiating his claim that the Commonwealth's fire science evidence was erroneous. This Court is unwilling to enforce the "catch–22" of defaulting Petitioner for failing to make the case that an expert is needed while denying the funds necessary to hire one. Petitioner cannot reasonably be said to have waived his substantive argument simply because the state courts refused him the means of making it. Having eventually acquired the services of a competent expert and having demonstrated that fire science has indeed changed as he alleges, Petitioner will not be procedurally barred on this question. Accordingly, the Court will review Count I on the merits, *de novo*.[7]

## III. Legal Standard

### A. *Federal Court Review of State Court Decisions*

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

In *Williams v. Taylor*, 529 U.S. 362, 404–05, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court explained the two-part analysis set forth in 28 U.S.C. § 2254(d). Under the first part of the review, the federal habeas court must determine whether the state court decision was "contrary to ... clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). A state court decision can be contrary to Supreme Court precedent in two ways: (1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law," or (2) "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to that reached by [the Supreme Court]." *Williams*, 529 U.S. at 404–05, 120 S.Ct. 1495.

A state court decision involves an unreasonable application of Supreme Court precedent: (1) "if the state court identifies the correct governing legal rule from the Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or (2) "if the state court either unreasonably extends a legal principle ... to a new context where it should not apply or unreasonably refuses to extend that

---

7. *See* discussion of Count I, *infra* pp. 463–66.

principle to a new context where it should apply." *Williams,* 529 U.S. at 407–08, 120 S.Ct. 1495.[8]

The Court's role is not akin to that of an appellate court, reviewing errors. *Bousley v. U.S.,* 523 U.S. 614, 621, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) ("[h]abeas review is an extraordinary remedy and 'will not be allowed to do service for an appeal,'" *quoting Reed v. Farley,* 512 U.S. 339, 354, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994) and *Sunal v. Large,* 332 U.S. 174, 178, 67 S.Ct. 1588, 91 L.Ed. 1982 (1947)); 39 Am.Jur.2d Habeas Corpus and Postconviction Remedies § 6. Likewise, the Court's purpose "is not to determine guilt or innocence of prisoner of crime charged." *Id.* This was made especially clear by the Anti–Terrorism and Effective Death Penalty Act of 1996 (AEDPA). *See Bell v. Cone,* 535 U.S. 685, 693, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) ("[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law").

■■■ Because this is not an appellate review of the Pennsylvania Supreme Court's decision, the Court must defer to the findings of fact reached by that Court whenever they are supported by probative evidence. *Wright v. West,* 505 U.S. 277, 302, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992); *Marshall v. Lonberger,* 459 U.S. 422, 432, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983); *Riley v. Taylor,* 277 F.3d 261, 285 (3d Cir.2001). This deference is not extended to questions of federal law or to mixed questions of federal law and fact. *Thompson v. Keohane,* 516 U.S. 99, 109–111, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995).

With respect to these latter questions, the Court may issue a writ of habeas corpus only if the Pennsylvania Supreme Court's decision is contrary to or an unreasonable application of federal law as determined by United States Supreme Court precedent. 28 U.S.C. § 2254(d); *Mitchell v. Esparza,* 540 U.S. 12, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003); *Williams v. Taylor,* 529 U.S. 362, 379, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Everett v. Beard,* 290 F.3d 500, 507–08 (3d Cir.2002).

## B. *Ineffective Assistance of Counsel*

The standard for ineffective assistance claims was established by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under *Strickland,* a Petitioner claiming ineffective assistance of counsel must demonstrate (1) that counsel's performance was deficient, i.e., falling below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced his client. *Id.,* 466 U.S. at 689–92, 104 S.Ct. 2052. In examining the question of deficiency, "[j]udicial scrutiny of an attorney's performance must be highly deferential." *Id.,* 466 U.S. at 689, 104 S.Ct. 2052:

A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defen-

---

**8.** The Court specified, however, that under this clause, "a federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams,* 529 U.S. at 410, 120 S.Ct. 1495.

dant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'

*Id.*

"[I]n considering claims of ineffective assistance of counsel, '[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp,* 483 U.S. 776, 794, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987), *citing U.S. v. Cronic,* 466 U.S. 648 665, n. 38, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). "To establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard for reasonableness.'" *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003), *quoting Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. Reasonableness is considered within the context of "prevailing professional norms." *Wiggins,* 123 S.Ct. at 2536, *quoting Strickland,* 466 U.S. at 688, 104 S.Ct. 2052.

However, even constitutionally deficient performance by counsel does not mandate the issuance of a writ of habeas corpus unless prejudice is shown. In order to demonstrate prejudice, the defendant must also show that counsel's alleged errors "were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. This in turn requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

"It is firmly established that a court must consider the strength of the evidence in deciding whether the *Strickland* prejudice prong has been satisfied. In *Strickland,* the Supreme Court emphasized that a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Buehl v. Vaughn,* 166 F.3d 163, 173 (3d Cir.1999).

The Pennsylvania Supreme Court's determination as to whether there was prejudice from counsel's deficiency is a decision on a mixed question of fact and law to which the Court must defer unless it is contrary to or an unreasonable application of United States Supreme Court precedent. 28 U.S.C. § 2254(d); *Kane v. Kyler,* 201 F.Supp.2d 392, 397, n. 9 (E.D.Pa.2001).

## IV. Claims of Error During the Guilt Phase

Petitioner's complaints can be divided into two categories: those alleging error at the guilt phase and those alleging error at the sentencing phase. The Court will address the former first, taking the Counts in order and then cumulatively.

### A. *Count I*

In Count I, Petitioner argues that new developments in fire science prove his claim of actual innocence. Petition at ¶¶ 15–16. Particularly, he avers that the fire science evidence presented at his trial, introduced to show that arson could be the only cause of the fire, has since been shown to be inaccurate.

*Legal Standard*

■ It is axiomatic that the execution of an innocent person is constitutionally intolerable. According to *Herrera v. Collins,* 506 U.S. 390, 417, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993):

[I]n a capital case a truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim. But because of the very disruptive effect that entertaining claims

of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be extraordinarily high.

Although *Herrera* does not specify the burden of proof that a petitioner must carry in order to meet the threshold showing, *id.* at 421, 113 S.Ct. 853 (O'Connor, J., concurring), it was suggested that "petitioner would at the very least be required to show that based on proffered newly discovered evidence and the entire record before the jury that convicted him, 'no rational trier of fact could [find] proof of guilt beyond a reasonable doubt.'" *Id.* at 429, 113 S.Ct. 853 (White, J., concurring in the judgment) (citing *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). "If the petitioner asserts his actual innocence of the underlying crime, he must show 'it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.'" *Calderon v. Thompson*, 523 U.S. 538, 559, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998), *quoting Schlup v. Delo*, 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); *U.S. v. Garth*, 188 F.3d 99 (3d Cir.1999); *Douglas v. Beard*, 2002 WL 550474 (E.D.Pa.2002); *Woods v. Brennan*, 2001 WL 1428343 (E.D.Pa.2001). "In other words, the habeas petitioner must show that there probably would be a reasonable doubt." *Herrera*, 113 S.Ct. at 882 (Blackmun, J., dissenting). In order to meet this burden, the new evidence must foreclose the possibility of guilt, or at least of a guilty verdict. *Woods*, 2001 WL 1428343 at *3.

Notably, the Court is not required to weigh the evidence:

[T]his inquiry does not require a court to 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

*Herrera*, 506 U.S. at 401–02, 113 S.Ct. 853, *quoting Jackson v. Virginia*, 443 U.S. at 318–19, 99 S.Ct. 2781.

Moreover, "[this] exception is concerned with actual as compared to legal innocence." *Woods*, 2001 WL 1428343 at *2, *quoting Calderon*, 523 U.S. at 559, 118 S.Ct. 1489. "'Actual innocence' means factual innocence, not mere legal insufficiency." *Garth*, 188 F.3d at 107. "Simply stated, 'actual innocence' means that the person did not commit the crime.'" *Id.*, *citing Johnson v. Hargett*, 978 F.2d 855, 860 (5th Cir.1992). The Supreme Court has often emphasized the narrow scope of the exception. *See, e.g. Calderon*, 523 U.S. at 559, 118 S.Ct. 1489. "To be credible, a claim of actual innocence must be based on reliable evidence not presented at trial." *Id.* (internal quotations omitted).

*The New Evidence*

██ Petitioner has convincingly shown that the fire science evidence presented by the Commonwealth at his trial has since been discredited. At the evidentiary hearing before this Court on March 24, 2003, Petitioner called a qualified expert in fire science investigation. Transcript of Evidentiary Hearing, March 24, 2003 ("E.H.T. 3/24"), 25. He presented evidence that modern fire science considers the Commonwealth's trial evidence to be an unreliable basis upon which to conclude that a liquid accelerant *necessarily* was involved

and that the fire could have been caused *only* by arson. In short, Petitioner's expert testified that the fire science evidence in this case was as consistent with an accidental fire—started in an upholstered chair in the living room as claimed by Petitioner—as with an accelerant fire intentionally started in either the kitchen or the living room. E.H.T. 3/24, 83. The Commonwealth offered no rebuttal witnesses. Accordingly, having heard and considered the testimony of Petitioner's expert, the Court finds it credible and accepts that the fire could have been caused *either* intentionally *or* by accident.

### Analysis

The question, however, is whether this new evidence is legally sufficient to prove that Petitioner is *actually innocent.* The Court concludes that it is not.[9] The critical fact in the Court's analysis is that the newly-discovered evidence demonstrates only that the fire *might* have been accidental; it does not foreclose the possibility that the fire was started by an arsonist using a liquid accelerant. E.H.T. 3/24, 84 and 94–96. Absent prosecutorial misconduct, which is not alleged, the only issue is whether the new evidence is sufficient to conclude that "no rational trier of fact could [find] proof of guilt beyond a reason-

able doubt." *Herrera,* 506 U.S. at 429, 113 S.Ct. 853.[10] Here, sufficient circumstantial evidence exists to support a rational inference that the fire was caused by arson and that Petitioner's conduct was deliberate. First, there was evidence that Petitioner had the means to commit the arson. A gas can was found in the trunk of his car. His fingerprints were on the can, which was covered in soot. Based on this evidence, a rational trier of fact could conclude that Petitioner intentionally started the fire with the gasoline, getting soot and his fingerprints on the gas can, then carried it out of the burning house and put it in the trunk of his car.

Second, from the evidence that Petitioner repeatedly abused his wife just before her death, a reasonable juror could conclude that he intended to harm her.[11] There was also evidence that Petitioner had threatened to burn down the house on several previous occasions and on the night in question. Answer at 5–6 (citing trial testimony of Larry Wimmer, John Wheeler, Valerie Cullingford, and Carol Kuhns). Furthermore, the evidence demonstrated that Petitioner had been drinking on the night before the fire, which would allow a rational juror to infer that he might have taken his violent behavior further than he had in the past. From this evidence, a

---

**9.** The Commonwealth asserts that this fire science is not new, as it was mentioned in at least one text at the time of the trial. E.H.T. 3/24, 100 (discussing the French text used by the insurance industry); *see generally* 28 U.S.C. § 2254(e) (requiring that the new evidence "could not have been discovered through the exercise of due diligence"). However, this text was not "the sort of thing that was available to fire investigators," E.H.T. 3/24, 100, and "wouldn't be easy" for an attorney of the time to acquire. *Id.* at 102. Furthermore, this literature was not scientific proof that the contemporary fire science was wrong, but was rather a suggestion that scientific testing was needed. *Id.* at 100. Thus, even to the extent that the literature challenging contemporary fire science was discover-

able by a duly diligent trial counsel, it fell far short of the evidence now before this Court. Accordingly, the evidence presented by Petitioner's expert at the evidentiary hearing will be considered "newly discovered."

**10.** Petitioner's expert was clear that the Commonwealth witnesses did not engage in deliberate concealment or misconduct. E.H.T. 3/24, 94 (had he investigated the case in 1979, based on the state of knowledge at the time, he would have reached the same conclusion reached by the investigators).

**11.** This is true even if the evidence is considered only for the limited purpose of showing motive. *See* discussion of Counts IV and V, *infra.*

reasonable juror could have inferred that Petitioner purposefully set the fire.

If a chain of reasonable inferences exists that would allow a rational trier of fact to conclude beyond a reasonable doubt that Petitioner was guilty of the crime of which he was convicted, actual innocence has not been shown. *Garth,* 188 F.3d at 107 ("Simply stated, 'actual innocence' means that the person did not commit the crime"). The test is not whether the Court would have found Petitioner guilty or whether the Court believes that Petitioner is guilty beyond a reasonable doubt. *Jackson,* 443 U.S. at 320, n. 13, 99 S.Ct. 2781 ("[T]he standard announced ... does not permit a court to make its own subjective determination of guilt or innocence"); *Herrera,* 506 U.S. at 400, 113 S.Ct. 853 ("[F]ederal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution-not to correct errors of fact"). Absent more definitive proof that the fire was of accidental origin, there was sufficient evidence for a rational juror to conclude that the fire was caused by arson and that Petitioner was the arsonist.

Accordingly, Petitioner has not demonstrated actual innocence and the claims asserted in Count I must be denied.

### B. *Count II*

■ Count II of the habeas petition claims a denial of due process, specifically denial of the right to a meaningful appeal, based on the absence of transcripts for significant portions of the trial. Only a small portion of the juror voir dire was transcribed, the testimony of seven de-

fense character witnesses was not transcribed at all, and the direct examination of the defense expert was not transcribed. Thus, Petitioner argues that he was unable meaningfully to perfect an appeal based on *potentially* improper questions or rulings in those portions of the trial. The Pennsylvania Supreme Court held that these claims had been waived by the failure to raise them in the earlier stages of PCRA appeal. *Albrecht II,* 720 A.2d at 701. Because that Court did not address the claims on the merits, this Court's review is *de novo. Appel,* 250 F.3d at 210.

■ A more complete record, particularly with respect to the fire science testimony, undeniably would have been preferable. The law is clear, however, that Petitioner bears the burden of demonstrating harm from the missing transcripts. The Court cannot award relief on the suggestion that the transcript *might* show prejudice. "A criminal defendant must first show a 'colorable need' for a complete transcript" before the state must respond. *Karabin v. Petsock,* 758 F.2d 966, 969 (3d Cir.1985), *quoting Mayer v. City of Chicago,* 404 U.S. 189, 195, 92 S.Ct. 410, 30 L.Ed.2d 372 (1971). "To warrant reversal, the defendant must further make a specific showing of prejudice as a result of the failure to produce the entire transcript." *Kindler v. Horn,* 291 F.Supp.2d 323 (E.D.Pa.2003), *citing U.S. v. Sierra,* 981 F.2d 123, 125 (3d Cir.1992).

Petitioner has also presented evidence to support his allegation that the Commonwealth attorney engaged in cross-examination of Petitioner's character witnesses that *might* not have been proper.[12] Howev-

---

**12.** During the cross-examination of one of Petitioner's character witnesses, the prosecutor asked whether the witness was aware of a 1962 assault conviction. Character impeachment with this conviction may not be appropriate under the Pennsylvania rules. *See* Petition at ¶¶ 72–87. However, the trial court did not rule on the objection to the question be-

cause the witness had already answered. Instead, the trial court warned the prosecutor that the evidence might not be admissible. Petition at ¶ 84. Although the prosecutor replied that he was "not going to sit here and have every witness come in here and talk about his reputation as being free from con-

er, although Petitioner directs the Court's attention to several possible violations that *might have* occurred, both during voir dire and during the trial, he does not aver that any actually *did* occur. "Petitioner's burden could have been met by introducing affidavits by petitioner, trial counsel, or both, of specific acts of prosecutorial misconduct or ineffective assistance that they believe would be reflected if a transcript existed." *Sulecki v. Zimmerman,* 1988 WL 71398 at *1, 1988 U.S. Dist. LEXIS 6421 (E.D.Pa.1988). No such affidavits were introduced with respect to any of the aforementioned allegations. Absent evidence of this type, the Court cannot conclude that inappropriate questions actually were asked.

The Court recognizes the risk of creating a "catch–22" whereby the absence of the transcripts precludes any attempt to obtain reversal. However, the alternative—overturning a jury verdict twice affirmed by the Pennsylvania Supreme Court without a supported allegation of impropriety—defies both common sense and the "colorable need" standard established in *Mayer* and *Karabin.* Accordingly, the petition must be denied with respect to the claims asserted in Count II.

### C. *Count III*

Count III alleges that the method of juror recruitment resulted in an unconstitutional jury panel. This allegation was addressed on the merits by the Pennsylvania Supreme Court on Petitioner's direct appeal, where that Court held that the methods used by the sheriffs at the trial court's direction were proper. *Albrecht I,* 511 A.2d at 771.

■ The Sixth Amendment does not mandate that every jury panel represent a fair cross-section of the community, but only that the jury venire does. *See United States v. Guy,* 924 F.2d 702 (7th Cir.1991) (Defendant's observation that no African-Americans were on jury panel insufficient to establish systematic exclusion); *United States v. Diaz,* 1993 WL 85764 (E.D.Pa. 1993) (finding that "the defendant's sole observation [that no Hispanics were on the jury panel] fails to show a systematic exclusion").

"In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); *see also Henry v. Horn,* 218 F.Supp.2d 671, 691–92 (E.D.Pa. 2002) ("Initially, the defendant must demonstrate the percentage of the community made up of the group alleged to be underrepresented, for this is the conceptual benchmark for the Sixth Amendment fair-cross-section requirement").

■ The Supreme Court has not clarified the meaning of the term "distinctive" in the context of the *Duren* analysis. *Henry,* 218 F.Supp.2d at 694. It is clear that shared ideas alone are not enough. *U.S. v. Salamone,* 800 F.2d 1216, 1220 (3d Cir.1986). Although the Third Circuit has not issued a comprehensive test to determine distinctiveness, courts in at least four Circuits, including this one, have applied the Eleventh Circuit's three-part test for

---

tacts with the law when I know it to be otherwise," *id.,* there is no evidence that the prosecutor actually followed through and asked questions about that prior conviction.

*See* Petitioner's Reply to Respondent's Answer to Petition for Writ of Habeas Corpus ("Petitioner's Reply") at 38; discussion of Count IV, *infra,* pp. 468–71.

distinctiveness: (1) that the group is defined and limited by some factor (i.e., that the group has a definite composition such as race or sex); (2) that a common thread or basic similarity in attitude, ideas, or experience runs through the group; and (3) that there is a community of interests among members of the group such that the group's interest cannot be adequately represented if the group is excluded from the jury selection process. *See Willis v. Zant,* 720 F.2d 1212, 1220 (11th Cir.1983); *see also U.S. v. Fletcher,* 965 F.2d 781, 782 (9th Cir.1992); *Ford v. Seabold,* 841 F.2d 677, 682 (6th Cir.1988); *Barber v. Ponte,* 772 F.2d 982, 987 (1st Cir.1985); *Henry,* 218 F.Supp.2d at 695. Accordingly, the Court will apply that standard in this case.

 Petitioner complains that the sheriff's deputies went to various area shopping malls and gave jury summonses to people they found there. Petition at ¶ 58. Some allegedly gave them principally to people that they knew. *Id.* at ¶ 59. Petitioner claims that presence at a particular mall or being an acquaintance of a deputy became de facto qualifications for the jury panel. *Id.* at ¶ 62. He argues that this, in turn, excluded two basic groups: (1) races other than those of the deputies and (2) those who were not at the malls on that day. This argument is legally insufficient to merit reversal.

With respect to his race claim, Petitioner has not provided even the most basic facts showing how many of the summoned jurors were of minority background and how that number compared to the population from which the jury pool was drawn. This Court cannot reasonably determine whether there was a racially disparate impact of the method of jury selection absent this information. Furthermore, Petition-

er's speculative argument that some jurors may have been excluded on racial or other prohibited grounds or that jurors in general were challenged on prohibited grounds is unsupported by facts and therefore fails.[13]

With respect to the claim that individuals who were not shopping on the day in question or who were shopping elsewhere were systematically excluded, the Court turns to the first prong of the *Duren* analysis, i.e., that the group allegedly excluded be "distinctive." Petitioner has not attempted to prove that the class of persons defined by not shopping at a particular mall or not knowing a deputy sheriff are defined or limited by any particular factor, that they have common attitudes, ideas, or experiences, or that they share any meaningful community of interest. *See Willis,* 720 F.2d at 1220. Thus, Petitioner has not even presented prima facie evidence that his panel was unfair, much less that this unfairness was systemic.

In light of the foregoing, it cannot be said that the Pennsylvania Supreme Court's determination that the methods used by the sheriffs' deputies comported with the *Duren* standards was contrary to or a misapplication of existing Supreme Court precedent. Accordingly, the Petition must be denied with regard to the claims asserted in Count III.

### D. *Count IV*

Count IV claims that trial counsel was ineffective for failing to object to evidence of prior bad acts. Petitioner avers that the Commonwealth introduced evidence that had been specifically excluded by a pre-trial ruling and evidence of a prior conviction that was nearly eighteen years old.[14] On PCRA appeal, the Pennsylvania

---

**13.** The Court cannot overturn a jury conviction that has twice been upheld by the Pennsylvania Supreme Court on the mere suggestion of impropriety.

**14.** The trial judge had limited the evidence of battery or infidelity to those acts that occurred within seven months of the fire. On direct appeal, the Supreme Court of Pennsyl-

Supreme Court denied these claims, holding that Petitioner had not shown sufficient prejudice to merit reversal. *Albrecht II,* 720 A.2d at 703. It also held that "the evidence in question was not of such a nature that its admission would result in the denial of a fair trial." *Id.* This Court's review is limited to the question of whether the Pennsylvania Supreme Court's decision was contrary to or an unreasonable application of United States Supreme Court precedent.

"The erroneous admission of evidence that is relevant, but excessively inflammatory, might rise to the level of a constitutional violation." *Lesko v. Owens,* 881 F.2d 44, 51 (3d Cir.1989). Where the evidence "so infuse[s] the trial with unfairness as to deny due process of law," the verdict must be overturned. *Estelle v. McGuire,* 502 U.S. 62, 75, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), *citing Lisenba v. California,* 314 U.S. 219, 228, 62 S.Ct. 280, 86 L.Ed. 166 (1941); *Dowling v. U.S.,* 493 U.S. 342, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990). However, "Judges are not free, in defining 'due process,' to impose on law enforcement officials [their] personal and private notions of fairness and to disregard the limits that bind judges in their judicial function. [They] are to determine only whether the action complained of ... violates those fundamental conceptions of justice which lie at the base of our civil and political institutions, and which define the community's sense of fair play and decency." *Dowling,* 493 U.S. at 353, 110 S.Ct. 668 (internal citations and quotations omitted). Furthermore, in deciding whether Petitioner was denied due process of law, this Court must consider the evidence in light of any limiting instructions given at trial. *Id.*

■ Petitioner contends that the prosecutor violated the trial court's order by examining him on alleged acts of infidelity that occurred more than seven months before the death of his wife. Defense counsel timely objected, although some allegations of infidelity had already been heard. Petition at ¶ 74–75. The trial judge denied a request for a mistrial, but instructed the jury to disregard the questions. Petitioner has presented no evidence that the jury disobeyed this instruction or that the evidence of remote acts of infidelity was a significant part of the Commonwealth's case. Furthermore, even if the jury disregarded the limiting instruction, it is difficult to perceive how the evidence of remote acts of infidelity could be so inflammatory as to deny due process when the jury had before it evidence of acts of infidelity within months of the fire. *See Albrecht II,* 720 A.2d at 703. Accordingly, the Court agrees with the Supreme Court of Pennsylvania that no prejudice accrued from the jury's limited exposure to this evidence.

■ Petitioner next objects to the Commonwealth's cross-examination, in which the prosecutor questioned him about instances of alleged spousal abuse that occurred more than seven months before his wife's death. The Pennsylvania Supreme Court, however, noted that these questions were put to Petitioner in response to his assertion that he had hit his wife only four or five times and only within a few months of the fire. *Albrecht II,* 720 A.2d at 703.[15] The trial court had ruled out admission of remote instances of spousal abuse as improper evidence of bad character and prior bad acts. However, once Petitioner denied having beaten his wife until shortly before the fire, the Commonwealth was entitled to

vania affirmed the trial judge's ruling. *Albrecht I,* 511 A.2d at 771–72.

15. Petitioner concedes that the prosecution did not introduce this evidence as a part of its case-in-chief. Petition at ¶ 78.

impeach his assertion. Thus, as the Pennsylvania Supreme Court held, trial counsel could not have expected to succeed on an objection, *id.*, and therefore counsel was not ineffective for failing to object. Finally, in light of the wealth of evidence of serious abuse in the months prior to Petitioner's wife's death, evidence of remote acts of spousal abuse would not be sufficiently prejudicial to merit reversal. Accordingly, the failure to object was not ineffective assistance and the admission of this evidence was not a due process violation.[16]

■ Finally, Petitioner claims that the Commonwealth improperly challenged the opinions of his character witnesses by inquiring into their knowledge of his 1962 assault conviction.[17] The Pennsylvania Supreme Court addressed this question on PCRA appeal, and held that under Pennsylvania law the evidence of the older conviction was admissible to impeach a reputation for peacefulness and that its admission was not so prejudicial as to violate due process. *Albrecht II*, 720 A.2d at 702, n. 10, and 703. Because this Court's review is limited to matters of federal constitutional law, the only question is whether the Pennsylvania Supreme Court's decision on the question of due process was contrary to or an unreasonable application of United States Supreme Court precedent. The Supreme Court has never directly addressed this question and this Court finds it highly unlikely that the mere allegation that Petitioner had some undefined criminal record substantially swayed the jurors in this case.[18] Therefore, this Court defers to the finding of the Pennsylvania Supreme Court that Petitioner's due process rights were not violated and his trial counsel was not ineffective for failing to object.

Whether taken separately or together, the admission of the aforementioned evidence did not render Petitioner's trial unfair or violate the community's fundamental conceptions of justice. Accordingly, the claims asserted in Count IV must be denied.

## E. *Count V*

■ Petitioner's fifth claim is that his trial counsel was ineffective for failing to request a limiting instruction with respect to the Commonwealth's evidence of spousal abuse, both recent and remote. On direct appeal, the Supreme Court of Pennsylvania held that "evidence regarding ill-will toward a victim in a homicide case is

---

16. The separate issue of whether trial counsel should have requested a limiting instruction on the uses of this evidence is addressed *infra*, in the discussion of Count V.

17. The transcripts are missing for seven of Petitioner's eight character witnesses. Defense counsel objected too late to prevent the first of the eight from answering the question. Petitioner's case is based on the assumption that, even having been warned by the trial judge that such questions were dangerous, the prosecutor nonetheless continued in this line of questioning. Without transcripts, this Court cannot determine whether the questions were actually asked. *See supra*, pp. 466–67. However, even assuming that they were, the Court finds that they did not infuse the trial with unfairness.

18. Petitioner cites only two Supreme Court cases in support of his contention—*Old Chief v. United States*, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) and *Rock v. Arkansas*, 483 U.S. 44, 52, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). In *Old Chief*, the Supreme Court held that where the details of a prior conviction might be prejudicial to the defendant if revealed, a District Court may not reject the defendant's offer to stipulate to prior convictions. In *Rock*, the Supreme Court struck down a rule which excluded *per se* any testimony refreshed by hypnosis. *Rock* does not address the prejudice engendered by the admission of prior bad acts. Thus, neither case clearly relates to the claims Petitioner asserts.

admissible" and that "when the deceased victim's spouse is the defendant, evidence concerning the marital relationship will be admissible for the purpose of illustrating ill-will, motive, or malice. Evidence regarding hostility and strain in a marriage is also admissible." *Albrecht I,* 511 A.2d at 772 (internal citations omitted).

 On PCRA appeal, Petitioner raised the issue of ineffectiveness of counsel, alleging constitutional error in counsel's failure to request a limiting instruction explaining the purposes for which the evidence of abuse could be used. In addressing this issue, the Pennsylvania Supreme Court, apparently misunderstanding Petitioner's claim, declined to revisit the question of admissibility. *Albrecht II,* 720 A.2d at 702–03. The fact that evidence is admissible, however, does not necessarily eliminate the need for a limiting instruction. Where prejudicial evidence is admissible for some purposes, but not for others, such an instruction would be appropriate.[19] *See Commonwealth v. Billa,* 521 Pa. 168, 555 A.2d 835, 841 (1989). Thus, the Supreme Court's holding that the evidence was admissible does not decide the question whether a limiting instruction should have been requested by counsel. *See* 28 U.S.C. § 2254(d). Because there are no findings with respect to this particular question, this Court's review is *de novo. Appel,* 250 F.3d at 210.

Trial counsel is not constitutionally required to request a limiting instruction any time that one could or would be given. *Buehl,* 166 F.3d at 170 ("In some circumstances, such an instruction may be strongly advisable; in others, counsel may reasonably conclude that it is strategically preferable to omit such a request since the instruction might have the undesired effect of highlighting the other crimes evidence"). However, the Court cannot find any valid strategic reason that trial counsel could have chosen not to request a limiting instruction in this case. The evidence of abuse was not briefly or fleetingly presented, but rather was a substantial portion of the Commonwealth's case. The Commonwealth's closing focused on the evidence of abuse, reviewed the violation of the state court order, and invited the jury to "carry it to its logical conclusion" and decide "what type of man is Al Albrecht." Petition at ¶ 99 (quoting the trial transcript from August 7, 1980). Once the Commonwealth had so forcefully focused on the prior bad acts, the danger of highlighting them had passed. Instead, in the absence of a limiting instruction, the jury was permitted to make the very character-propensity inference that the Pennsylvania Rules of Evidence prohibit and the prosecutor all but invited.[20] *See* Pa. R. of Evid. 404(b) and Petition at ¶ 99.

In *Billa, supra,* 555 A.2d at 841–43, the Pennsylvania Supreme Court held that counsel was deficient when he failed to request an appropriate limiting instruction relating to inflammatory evidence of prior bad acts. Where "it is apparent on this record that appellant's underlying claim had arguable merit," the Court held, "the court's failure to give such an instruction, upon request, would have been reversible error." 555 A.2d at 842. The court found "counsel to have been constitutionally ineffective in failing to request an appropriate

---

**19.** In this case, the Supreme Court of Pennsylvania held that the evidence was admissible to show ill will, motive, or malice. *See Albrecht I,* 511 A.2d at 772; *see also* Pa. R. Evid. 404(b)(2). However, Pa. R. Evid. 404(b)(1) is clear that the evidence of prior wrongs, crimes, or acts is not admissible to prove the character of a person or to show conformity therewith.

**20.** The Court makes no finding as to whether such an inference was actually made by jurors. However, counsel was deficient for failing to foreclose the possibility that such an inference would be made.

limiting instruction." 555 A.2d at 843. This Court agrees with the logic of *Billa*, and holds that the failure to request a limiting instruction was deficient assistance of counsel.

■ In order to find counsel ineffective, the Court must also find that Petitioner was prejudiced by this deficiency. There is no way of knowing whether the jury made the improper character-propensity inference. However, had the jury considered the prior bad acts evidence only for the permissible purpose of demonstrating ill will, malice, or motive, a reasonable juror could still have found Petitioner guilty.[21] Thus, Petitioner has presented the Court with no reason to believe that the jury made a character-propensity inference or would have to do so. The Court's confidence in the jury's verdict is unshaken. *See Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. Accordingly, the claims asserted in Count V of the Petition must be denied.

### F. *Count VI*

Petitioner alleges that the admission of hearsay statements against him violated his rights under the Confrontation Clause of the Sixth Amendment. Petition at ¶ 109. Alternatively, he alleges that these statements were inadmissible hearsay under state law and that his attorney's failure to object to them constitutes ineffective assistance of counsel. Petition at ¶ 109 and ¶ 235.

### *Legal Standard*

■ "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const., Amend. VI. Admission of hearsay statements against a criminal defendant violates the Confrontation Clause unless the statement is admitted pursuant to a "firmly rooted hearsay exception" or exhibits "particularized guarantees of trustworthiness." *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).

■ Where a declarant testifies at trial, the Confrontation Clause generally does not apply to statements purportedly made by that declarant, even if they were introduced into evidence prior to declarant's testimony. *See California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). However, if these statements are also inadmissible under the state rules of evidence, the failure to object to them can constitute ineffective assistance of counsel if their admission was prejudicial to the defendant. *See Carpenter v. Vaughn*, 296 F.3d 138, 159 (3d Cir. 2002) ("the failure of ... trial counsel to object based on state law constituted ineffective assistance of counsel." The Circuit even emphasized that its "holding is not based on any other federal constitutional right").

A state court's determination of prejudice is a decision on a mixed question of fact and law to which the Court must defer on habeas review unless it is contrary to or an unreasonable application of United States Supreme Court precedent. 28 U.S.C. § 2254(d); *Kane v. Kyler*, 201 F.Supp.2d at 397, n. 9.

### *Statements by Petitioner's Wife to Her Physician, Her Attorney, and Her Neighbor*

■ At trial, numerous statements made by Petitioner's wife to her physician, her attorney, and her neighbor were admitted to show the pattern of abuse. On direct appeal, the Pennsylvania Supreme Court held that these conversations were admissible under the hearsay exception for statements showing a course of conduct.[22]

---

**21.** *See* the Court's discussion of cumulative prejudice, *infra*, pp. 484–86.

**22.** Petitioner argues at length that this was an incorrect decision under Pennsylvania law,

*Albrecht I,* 511 A.2d at 776, *citing Commonwealth v. Cruz,* 489 Pa. 559, 414 A.2d 1032 (1980). Because the Court finds that the statements had particularized indicia of reliability, it need not reach the issue of whether this exception is firmly rooted.

There is overwhelming evidence that Petitioner abused his wife. Numerous witnesses, including her physician, testified to the physical manifestations of abuse, including bruising and cigarette burns. Answer at 3–5. Petitioner's son stated that his father hit his mother on the night before the fire. Petitioner's Post–Hearing Memorandum of Law, Exhibit 1, at 27. Police reports from the night before the fire suggest a domestic disturbance. Even standing alone, the restraining order entered against Petitioner in his wife's Protection from Abuse Act case represents a judicial finding that abuse was occurring. Furthermore, the Petition does not contest the fact that Petitioner abused his wife. *See* Petition at ¶ 122; *Albrecht II,* 720 A.2d at 703. Accordingly, there can be no doubt that Petitioner abused his wife on multiple occasions. This imbues the statements made by his wife to her physician, her attorney, and her neighbor with indicia of trustworthiness.

Particularly with respect to the conversation with her physician, the context of the statements also indicates reliability.[23] The theory that Petitioner's wife was falsely complaining of abuse to her physician, her attorney, and her close friends while the abuse was admittedly occurring strains

credulity. Accordingly, the Court finds that the statements admitted had particularized guarantees of trustworthiness sufficient to satisfy the standard set forth in *Roberts.* Since the Pennsylvania Supreme Court ruled that the evidence was admissible under Pennsylvania law, counsel cannot be faulted for failing to object to its admission.

Furthermore, even assuming *arguendo* that the admission of the statements violated the Confrontation Clause, at most they were a small part of the Commonwealth's compelling proof of abuse. Accordingly, admission of these statements was not prejudicial. For both reasons, their admission was not a violation of the Confrontation Clause and the claims in Count VI based upon them must be denied.

*Statements by Petitioner's Wife to Her Acquaintances*

Petitioner also challenges the testimony of two of his wife's acquaintances, who provided additional evidence of abuse. On PCRA appeal, the Pennsylvania Supreme Court rejected this argument, holding that the statements and observations to which these witnesses testified was merely cumulative of the other evidence of abuse and was therefore not prejudicial. *Albrecht II,* 720 A.2d at 705. As described above, the evidence of abuse was overwhelming and the fact of abuse is not contested by Petitioner. Accordingly, this Court agrees with the determination of the Pennsylvania

---

but this Court may address only violations of the federal constitution.

**23.** While statements made for the *purpose of a medical diagnosis are generally admissible in Pennsylvania, Pa. R. of Evid. 803(4), the identity of an assailant generally does not fall within this exception. *Commonwealth v. Sanford,* 397 Pa.Super. 581, 580 A.2d 784, 792 (1990); *Commonwealth v. Smith,* 545 Pa. 487, 681 A.2d 1288, 1292 (1996); *Commonwealth*

*v. D.J.A.,* 800 A.2d 965, 976–77 (Pa.Super.2002). Accordingly, the Pennsylvania Supreme Court held the statements admissible under the course of conduct exception, not under Rule 803(4). Nevertheless, the principle underlying the exception, that individuals are less likely to lie when they are seeking medical treatment, applies to the Confrontation Clause determination of whether the statements are reliable.

Supreme Court that no additional prejudice accrued from the admission of these statements and observations and will therefore deny the claims raised in Count VI based on them.

*Statements by Petitioner's Son*

■ Petitioner claims that the admission of hearsay statements made by his son to their neighbors on the night before the fire was improper. Petitioner's neighbors testified at trial that on the night before the fire, Petitioner's son came to their house and told them that Petitioner was beating his wife and threatening to burn the family house down.[24] Over objection, the trial court admitted these statements as excited utterances.[25] *See* Pa. R. Evid. 803(2). On PCRA appeal, the Supreme Court of Pennsylvania disagreed, finding that the statements were inadmissible hearsay. *Albrecht II,* 720 A.2d at 704–05.

The neighbors' testimony includes two separate assertions of fact—first that Petitioner was beating his wife and second that Petitioner had threatened to burn down the house. The admission of the first of these does not violate the Confrontation Clause, since it was supported both by the observations of a police officer who went to the house that evening and by the testimony of Petitioner's son. Furthermore, as noted above, Petitioner's history of spousal abuse vests the statements with significant indicia of reliability.

■ However, evidence of the alleged threat to burn down the house is not supported by any indicia of reliability. Indeed, it was expressly disavowed by the alleged declarant, who testified that Petitioner threatened to burn his wife's dress, not the house. The Pennsylvania Supreme Court addressed this claim as a hearsay claim and found that, while the admission of the statement of Petitioner's son was improper, the error was not prejudicial. *See Albrecht II,* 720 A.2d at 704–05. Accordingly, it also found that Petitioner's counsel's failure to object to it was deficient, but that counsel's performance was not ineffective since the error was not prejudicial. *Albrecht II,* 720 A.2d at 705.

Although the improper admission of Petitioner's alleged threat to burn down the house is troubling, the Court is unable to find that, standing alone, it was so prejudicial that the Pennsylvania Supreme Court's decision is contrary to or an unreasonable application of existing United States Supreme Court precedent. *See generally Estelle v. McGuire,* 502 U.S. at 75, 112 S.Ct. 475 (only when admission of evidence "so infused the trial with unfairness as to deny due process of law" does its admission violate due process). Petitioner's son expressly denied making this statement during his testimony at trial. Furthermore, even if the jury credited the neighbors' version of events, there was ample evidence on which to base a conviction entirely divorced from this alleged threat. *See infra,* pp. 484–86. Accordingly, the claims in Count VI with respect to this statement will be denied.

*Conclusion*

The Court finds that none of the foregoing alleged violations of the Confrontation Clause or alleged instances of ineffective assistance of counsel merits the issuance of a writ of habeas corpus. Accordingly, the claims raised in Count VI will be denied.

---

**24.** Significantly, during his trial testimony, Petitioner's son denied making any statement about his father threatening to burn down the house. Petitioner's Reply to Answer to Petition for Writ of Habeas Corpus at 52–53.

**25.** Since Petitioner's counsel objected at trial and since the Pennsylvania Supreme Court addressed the issue on the merits on PRCA appeal, any ineffective assistance claim in this respect fails. This leaves only the Confrontation Clause objection for the Court to address.

## G. *Count VII*

■ Count VII alleges the ineffective assistance of trial counsel in failing to object to the trial court's instructions regarding attorney-client contact during recesses.[26] The Pennsylvania Supreme Court held that this claim had been waived by the failure to raise it in the earlier stages of PCRA appeal. *Albrecht II*, 720 A.2d at 704. Because that Court did not address the claim on the merits, this Court's review is *de novo*. *Appel*, 250 F.3d at 210.

■ Petitioner is not offering an independent federal constitutional challenge to the trial court's instruction, but rather is asserting that the failure to protect his state law rights was ineffective assistance of counsel under the federal constitution. Response at 56. The failure to object based on state law may form the basis for an ineffective assistance of counsel claim. *See Carpenter*, 296 F.3d at 159.

The question then is whether Petitioner had a state law right to confer with counsel during recesses occurring while he was testifying. Petitioner avers that Pennsylvania law forbids courts from denying the right to counsel during recesses. *See* Petition at ¶¶ 129–130, *citing Commonwealth v. Werner*, 206 Pa.Super. 498, 214 A.2d 276, 277 (1965), and *Commonwealth v. Vivian*, 426 Pa. 192, 231 A.2d 301 (1967). This contention is not without merit. For many years, the Pennsylvania Supreme Court consistently held that no limitation of consultation was permissible. *Vivian*,

231 A.2d at 304 ("there is no justification for imposing a restriction of silence between accused and counsel during a trial recess") (internal quotations omitted); *Commonwealth v. Barber*, 250 Pa.Super. 427, 378 A.2d 1011, 1012–13 (1977). Indeed, the Pennsylvania Supreme Court has never officially overruled those decisions.

However, the *Vivian* line of cases was based on the Pennsylvania Supreme Court's interpretation of the United States Constitution. *See Vivian*, 231 A.2d at 303–04 ("This case also poses the serious question of whether or not Vivian's right to the assistance of counsel, *as guaranteed by the Sixth Amendment to the United States Constitution*, was illegally restricted") (emphasis added). While Petitioner is correct that the United States Supreme Court cannot overrule the Pennsylvania Supreme Court's interpretations of Pennsylvania law, which may extend the bounds of the right to counsel beyond those established by the United States Constitution, the United States Supreme Court remains the final arbiter of the bounds established by the federal Constitution. The *Vivian* line of cases is explicitly based on an interpretation of the Sixth Amendment to the *federal* Constitution. Thus, decisions of the United States Supreme Court interpreting the Sixth Amendment may overrule or supplant *Vivian* and its progeny.

In 1989, the United States Supreme Court decided *Perry v. Leeke*, 488 U.S. 272, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989),

---

**26.** The trial court had instructed Petitioner that consultation with his attorney was allowed during the recesses while he was on direct examination. However, during the recess between direct and cross examinations, the trial judge instructed Petitioner that, "Since you [Petitioner] are about to begin cross examination, you are directed not to talk with your attorney. In other words, when you resume the stand for cross examination it will be just as though you did not have the opportunity to talk with anyone about the case." Petition at ¶ 126, *citing* Trial Transcript, 8/5/80 at 44. During the luncheon recess, the trial judge was even more explicit about the scope of this bar, "I remind you [Petitioner] that when you return you will be on the stand under cross-examination. You are not to discuss *any aspect of this case* or your testimony with anyone during the lunch break." Petition at ¶ 127, *citing* Trial Transcript, 8/5/80 at 112–13 (emphasis added).

which clarified the effect of the Sixth Amendment right to counsel on court recesses. Although it declined to overturn the decision in *Geders v. United States*, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976), which held that a defendant cannot be precluded from consulting with counsel during overnight recesses, the *Perry* Court also declined to hold that the right to counsel is absolute during all recesses. Instead, the Court held that a defendant may be completely precluded from consultation with his attorney during a 15–minute recess between direct and cross examinations. *Perry*, 488 U.S. at 282–84, 109 S.Ct. 594. Accordingly, the Court finds no constitutional error in the trial court's instruction preventing Petitioner from consulting with counsel during the recess between direct and cross examinations.

■ Petitioner also raises a Sixth Amendment challenge to the trial judge's order preventing him from consulting with his attorney during a two-hour recess in the middle of the Commonwealth's cross examination of him. This issue is one of first impression in this Circuit. According to *Perry*, "in a short recess in which it is appropriate to presume that nothing but the testimony will be discussed, the testifying defendant does not have a constitutional right to advice." 488 U.S. at 284, 109 S.Ct. 594. The Court finds that in the context of an ongoing cross-examination, a recess of an hour or two is more akin to the 15–minute recess in *Perry* than the overnight recess in *Geders*. During such a

short period, the Court is convinced that the sole relevant topics of discussion would be either the testimony itself or issues which directly bear on it.[27]

Accordingly, the Court finds that Petitioner was not denied his Sixth Amendment right to counsel and that trial counsel therefore was not ineffective for failing to object to the trial court's instructions.[28] Thus, the claims asserted in Count VII must be denied.

## H. *Count VIII*

■ Count VIII claims ineffective assistance of counsel for failure adequately to investigate and address Petitioner's mental condition and the effect of medications that he was taking on his demeanor and competence to testify. This claim raises questions that affect both the propriety of the guilt phase and of the sentence. Because the Court will vacate the sentence of death on other grounds, *see* pp. 484–86, *infra*, only those issues affecting the question of guilt, the competence to stand trial, or the capacity to testify will be addressed in this section. The Pennsylvania Supreme Court held that these claims had been waived by the failure to raise them in the earlier stages of PCRA appeal. *Albrecht II*, 720 A.2d at 705–06. Because that Court did not address the claims on the merits, this Court's review is *de novo*. *Appel*, 250 F.3d at 210.

Petitioner has produced substantial evidence that at the time of trial, he suffered from significant mental impairments.[29]

27. "Permitting a witness, including a criminal defendant, to consult with counsel after direct examination but before cross-examination grants the witness an opportunity to regroup and regain a poise and sense of strategy that the unaided witness would not possess .... [C]ross-examination of a witness who is uncounseled between direct examination and cross-examination is more likely to lead to the discovery of truth than is cross-examination of a witness who is given time to pause and

consult with his attorney." *Perry*, 488 U.S. at 282, 109 S.Ct. 594.

28. *Accord People v. Enrique*, 165 A.D.2d 13, 566 N.Y.S.2d 201 (1st Dept.1991).

29. Dr. Barry Crown, a neuropsychologist, conducted testing during Petitioner's appeals that shows diffuse brain damage to the anterior portion of his brain, most likely caused by his documented alcohol abuse or by environmental toxins such as pesticides that he in-

However, the touchstone question for ineffective assistance is whether counsel acted reasonably within professional standards when researching and evaluating these questions at trial, not whether another course of conduct appears appropriate now, after other testing has been done and post hoc opinions given. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 (The Court must consider the challenged conduct "from counsel's perspective at the time").

Two mental evaluations of Petitioner were performed prior to his trial in 1980. The first was performed by Gerald Cooke, a clinical psychologist. Dr. Cooke concluded that, while Petitioner "showed no obvious disorder of thought or affect" and "presents as an uneducated man, but one of average intelligence," he is a person "of rather limited intelligence." Petition, Exhibit 8, at 1, 3. In tests conducted by Dr. Cooke, Petitioner demonstrated an IQ of 80, which puts him in the bottom 10% of the population, at the lowest limit of the Dull Normal Range. *Id.* at 3. Individual topic areas demonstrated an even lower IQ, particularly in short term memory,

where Petitioner's demonstrated IQ of 64 placed him "well into the retarded range" and at the bottom 1% of the population. *Id.* Subjectively, Petitioner demonstrated a tendency to bluff or rationalize where he did not know the correct answer, often firmly asserting obviously incorrect answers. *Id.* Dr. Cooke made no explicit finding with respect to Petitioner's competency to testify or to stand trial.

Petitioner's trial counsel also requested a competency evaluation from Robert Sadoff, M.D. Dr. Sadoff favorably cited Dr. Cooke's report, joining in its conclusion that Petitioner was not the victim of a serious psychiatric disorder, in need of hospitalization, or suicidal. Petition, Exhibit 9, at 2. However, Dr. Sadoff expressly concluded that Petitioner "is currently mentally competent to proceed legally," that he "knows the nature and consequences of his current legal situation," and that he "can work with counsel in preparing a rational defense." *Id.*

Petitioner argues that his counsel could not have acted effectively because counsel's investigation was incomplete, in that

haled while working on his father's farm. Petition, Exhibit 6, at 1–2. Dr. Crown concluded that Petitioner's ability to solve problems using language is equal to that of a child of nine years and nine months. *Id.* at 2. According to Dr. Crown, the brain damage has also led to impaired nonverbal memory, impaired nonverbal problem solving skills, and impairments to concentration, reasoning, attention, memory and mental flexibility. *Id.* These problems are particularly acute when Petitioner is under stress. *Id.* Based on his review of the records, Dr. Crown concluded that Petitioner "suffered from an extreme mental or emotional disturbance." *Id.*, p. 4. Had Dr. Crown been consulted, he avers that he "would certainly have wanted to explore such questions thoroughly prior to any decision that [Petitioner] would testify." *Id.*

A similar claim is made by Dr. Robert Fox, a psychiatrist. Reviewing Dr. Crown's report and reports made at the time of trial, Dr. Fox concluded that Petitioner suffered from or-

ganic brain syndrome and Post–Traumatic Stress Disorder, the latter resulting from the death of his father at a young age, the physical abuse Petitioner observed and experienced, and the loss of his family farm. Petition, Exhibit 7, at 3. He further concluded that at the time of the fire, Petitioner was alcohol dependent and suffering from dysthymic disorder, a form of depression. Given these impairments, Dr. Fox has "serious questions about [Petitioner's] competency to testify at the trial" and "would have wanted to explore such questions before any decision that he would testify were made." *Id.* at 5. Dr. Fox is particularly concerned that these difficulties would have affected Petitioner's ability to testify coherently at trial, as victims of organic brain syndrome confabulate—that is, they fill in gaps in their memory with incorrect facts that they believe to be accurate memories. *Id.* at 6. In addition, Petitioner was taking medications that tended to make him drowsy and affected his appearance. *Id.*

it did not discover the organic brain damage or dysthymia. Even assuming, *arguendo*, that the investigation was incomplete, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins*, 123 S.Ct. at 2539, *quoting Strickland*, 466 U.S. at 690–91. The Court must therefore evaluate the strategic choice to call the Petitioner to the stand in light of the allegedly incomplete investigation by determining to what precise extent the limitation on investigation was reasonable.

Counsel's investigation into competence issues seems to have ended with Dr. Sadoff's conclusion that Petitioner was competent. Given that the crime did not necessarily implicate Petitioner's sanity, that Petitioner "showed no obvious disorder of thought or affect," "present[ed] as an uneducated man, but one of average intelligence," and that *Petitioner's own expert* had determined that Petitioner was competent to be tried, the Court cannot conclude that terminating the investigation at this point was unreasonable.

Finally, while Petitioner avers that trial counsel failed adequately to advise him against testifying at trial, he has introduced no evidence of this failure.

■ Petitioner also claims ineffective assistance due to counsel's alleged failure to investigate the medications that Petitioner was taking at the time of trial, specifically Sinequan and Serax. Petitioner claims that these medications affected his demeanor at trial, making him appear sedated and limiting his capacity to demonstrate emotion, with the effect of prejudicing the jury's opinion of him. Petition at ¶¶ 147–48. Petitioner avers that trial counsel should have informed the jury about Petitioner's medications, requested an instruction to inform the jury of those medications, and requested that the jury

be allowed to see Petitioner in his unmedicated state. Petition at ¶ 148. While the concerns that Petitioner raises are echoed in Justice Kennedy's concurrence in *Riggins v. Nevada*, 504 U.S. 127, 142, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992), which Petitioner cites, *Riggins* dealt with the forced medication of a defendant before trial. There is no evidence that Petitioner's medication was involuntary or was designed to make him competent to be tried.

Petitioner asserts that counsel unreasonably failed to request that the jury be allowed to see him in his "undrugged, anxious, and depressed state." Petition at ¶ 148, *citing Commonwealth v. Holland*, 518 Pa. 405, 423, 543 A.2d 1068 (1988). However, *Holland* deals with demeanor during sentencing, where perceptions of a defendant's emotional state are particularly important, not trial. This section deals only with errors in the guilt phase. Petitioner has failed to demonstrate that had the jury seen him unmedicated, this could be expected to have any effect on their determination of guilt.

Furthermore, the choice not to bring the medication to the jury's attention during the guilt phase was well within the range of sound trial strategy. Petitioner's counsel might reasonably have concluded that highlighting his client's depression and anxiety to the jury would have led them to conclude that he was more likely to have the mental state required to commit the crimes charged. Alternately, counsel might have been concerned that they would conclude that the anxiety and depression were the result of having committed the crime. Either way, since Petitioner's own expert had concluded that he was competent to stand trial and that he would have known the "nature and quality" of his acts had he started the fire, Petitioner's counsel might reasonably have concluded

that informing the jury that Petitioner was medicated would do more harm than good, at least during the guilt phase. Accordingly, the Court finds no deficiency in counsel's failure to inform the jury of Petitioner's medication during the trial phase or to request a jury instruction about it at that time.

It is also not clear that Petitioner's testimony was substantially affected by his medication. Although Petitioner describes his testimony at trial as "rambling, incoherent, and full of irrelevant details," Petition ¶ 149, Dr. Crown's report suggests that this is a symptom as likely to be related to his personality or his personality disorders as to his medication. Similarly, Petitioner's failures of recollection seem as likely to be related to the memory deficiencies noted in Dr. Crown's report than to his medication. Petition, Exhibit 6, at 1–2. At the time of trial, Dr. Sadoff said that Petitioner slept and ate well and was not having difficulty in prison. Petition, Exhibit 9, at 2. Dr. Cooke noted that Petitioner seemed less depressed than he actually was. Petition, Exhibit 8, at 4. Both of these comments suggest that the effect of the medication may not have been immediately perceptible to trial counsel. Furthermore, there remains the possibility that the medication actually allowed Peti-

tioner to be more expressive, if it allowed him to function more normally and to appear less depressed than he was. *Id.* Given the high level of deference that must be given to counsel's trial strategies, the Court cannot find that counsel was deficient in addressing the issue of Petitioner's medication.

Finally, Petitioner has not suggested that his sleepy or sedated demeanor was ever commented upon by the Commonwealth or brought to the jury's attention. Given that Petitioner has not demonstrated that the medications actually had a significant, perceptible negative effect on his testimony, he has failed to demonstrate prejudice.

The claims asserted in Count VIII will therefore be denied.

## I. *Brady Violations*

Although no claims pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), were included in the original Petition, the Court has agreed to hear those *Brady* claims which derive from evidence first disclosed pursuant to this Court's Order of January 26, 2001. *See* Order of January 10, 2003 (docket no. 47).[30]

---

**30.** In an Order dated Jan. 10, 2003, this Court found that Petitioner was entitled to an evidentiary hearing based on his *Brady* claims. The Court also found that if the witness statements forming the basis of the *Brady* claims were truly unavailable to Petitioner until provided in compliance with this Court's January 26, 2001 Order, Petitioner might have a valid claim for habeas relief arising out of the alleged *Brady* violation. Further, this Court noted that the *Brady* claims would not be procedurally defaulted and Petitioner would not be "at fault" for the failure to develop the factual basis of this claim in state court proceedings under § 2254(e)(2) if the witness statements were unavailable to him at the time of those proceedings. *See Strickler v.*

*Greene,* 527 U.S. 263, 283–84, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (holding that habeas petitioner established "cause" for procedural default in failing to raise *Brady* claim either in trial court or in state habeas proceeding, where exculpatory material was withheld by the prosecution and state asserted during state habeas proceedings that petitioner had already received "everything known to the government"); *Williams,* 529 U.S. at 435, 120 S.Ct. 1479 ("Diligence for purposes of the opening clause [of § 2254(e)(2)] depends upon whether the prisoner made a reasonable attempt, in light of information *available at the time,* to investigate and pursue claims in state court.") (emphasis added).

Petitioner's *Brady* claims are based on the alleged failure timely to disclose two distinct groups of statements. The first group consists of the statements of Allen Doelp, Thomas Jacob, Carol Frick, Elwood Steich, and Valerie Cullingford, all Commonwealth witnesses who testified at trial. Petitioner concedes that the statements of Doelp, Frick, Steich, and Cullingford were provided at the outset of cross-examination. He does not concede that Mr. Jacob's statement ever was disclosed. The second group of statements consists of the statements of Jeffrey Doelp and Nancy Mohr, who did not testify at trial. With respect to those statements disclosed at trial, Petitioner's *Brady* claim is based on dilatory disclosure. With respect to those not disclosed at trial, his *Brady* claim is based on non-disclosure.

The threshold question, both with respect to whether the Court can hear *Brady* claims and with respect to whether those claims will succeed, is whether the materials actually were disclosed to Petitioner's trial counsel at the time of trial. *Kyles v. Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). At the evidentiary hearing on March 24, 2003, there was considerable discussion about whether the materials were disclosed at the time of trial.

The sum total of the evidence presented by Petitioner in favor of his claim that the materials were not timely disclosed is the Declaration of Stanford Shmukler, Esq.,

Petitioner's trial counsel ("Declaration").[31] In short, the Declaration states that: (1) Attorney Shmukler has no independent recollection of whether or not he received the materials in question; (2) during the PCRA proceedings, Attorney Shmukler provided his trial preparation materials to David Shenkle, Petitioner's attorney at the time; (3) Attorney Shmukler has reviewed the trial preparation materials and the remainder of the file in Petitioner's case with Petitioner's current counsel, but such review has not refreshed Attorney Shmukler's recollection; and (4) any witness statements that were provided to Attorney Shmukler would normally be included in his trial preparation file. *See* Declaration ¶¶ 3–5.[32]

Petitioner also called the prosecuting attorney, Robert Goldman, Esq., at the evidentiary hearing. Attorney Goldman, now an Assistant United States Attorney, testified at length about his general disclosure practices in criminal cases, although he noted that, "thinking back 22 years, it's difficult to say exactly what I gave at any given time." T.E. 3/25/03, at 20. Goldman's normal practice was to make the disclosures required by law before trial, but otherwise to provide witness statements to defense counsel at the end of the direct examination of those witnesses. T.E. 3/25/03 at 19–25, 28.

Petitioner asks the Court to conclude that the absence of the statements of Jeffrey Doelp, Nancy Mohr, and Thomas Ja-

---

31. This Declaration was introduced into evidence as Petitioner's Exhibit 5 at the evidentiary hearing.

32. The parties further stipulated that Attorney Shmukler, if called at the evidentiary hearing, would have testified that he reviewed the file that he turned over to Attorney Shenkle, that it was consistent with what he turned over, but that he has no independent recollection as to whether it is the complete file. Transcript of Evidentiary Hearing ("T.E."), March 25,

2003, at 6. The Court summarized Attorney Shmukler's position as follows, "This is the file I have and I can't tell you whether that was everything that was turned over or whether it wasn't everything that was turned over. But I can tell you that this—what I have here in this file—was turned over, but I can't tell you anything from present recollection" about whether additional materials were also disclosed. *Id.* at 15. Petitioner's counsel agreed that this was an accurate characterization. *Id.*

cob from Attorney Shmukler's case file indicates that these statements were never disclosed. Attorney Goldman's general practice was not to disclose the statements of witnesses who did not testify. This supports the inference that the statements of Doelp and Mohr were never disclosed. Accordingly, the Court concludes for the purposes of this Petition that the statements of Doelp and Mohr (hereinafter the "Undisclosed Statements") were not disclosed to Petitioner's counsel at trial.

With respect to the statement of Mr. Jacob, however, the Court would have to conclude that Attorney Goldman deviated from his practice, without any evidence for this proposition beyond the statement's absence from the trial folder, which, under the circumstances recited above, is insufficient. Experience demonstrates that even well-kept files may not remain entirely intact over the course of two decades. Indeed, it was suggested at the evidentiary hearing that some trial materials that are known to have been disclosed were not present in the file as it now exists. T.E. 3/25/03, at 28 (Attorney Goldman's statement that "[N]ot all the correspondence I sent [Attorney Shmukler] is in the file"). The evidence thus suggests, and the Court concludes for the purposes of ruling on this Petition, that the statements of Allen Doelp, Thomas Jacob, Carol Frick, Elwood Steich, and Valerie Cullingford (the "Disclosed Statements") were disclosed no later than the beginning of cross-examination.

This Court granted leave to argue the *Brady* claims for materials that were never disclosed to Petitioner and to which he therefore had no access during direct or collateral appeal. The Disclosed Statements have been in Petitioner's possession since trial. Accordingly, those statements were available to Petitioner during his direct and PCRA appeals and he has procedurally defaulted on any *Brady* claims based on them by failing to bring the claims at any point prior to this Petition.[33]

With respect to the Undisclosed Statements, the analysis necessarily differs. The Court has already excused the procedural default caused by Petitioner's failure to raise *Brady* claims based on statements that were not disclosed at trial. *See* Court's Order of Jan. 10, 2003. Accordingly, the Court will consider these claims on the merits. Evidence is exculpatory if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555. A reasonable probability is one "sufficient to undermine confidence in the outcome." *U.S. v. Bagley,* 473 U.S. 667, 682 and 685, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

■ Petitioner contends that several of the Commonwealth's other witnesses had changed their pre-trial statements that the two were equally sooty to observations at trial that Petitioner had less soot on him than his son. Petitioner's Post–Hearing Memorandum of Law at 30–32. This latter version, Petitioner claims, implies that Petitioner and his son were not similarly situated (i.e. in bed inside the house) when the fire started. Petitioner's Reply to Respondent's Post–Hearing Memorandum at 18. Petitioner argues that the Undisclosed Statements show the presence of soot on Petitioner following the fire.

Petitioner's argument is without merit. The presence or absence of soot was not a significant portion of the Commonwealth's case. In fact, the Commonwealth never mentioned soot in its closing argument.

---

**33.** Unlike those claims described in Section II, *supra,* Petitioner did not raise his *Brady* claims before the Pennsylvania Supreme Court. Thus, that Court's decision to end its relaxed waiver doctrine had no effect on Petitioner's *Brady* claims.

Attorney Goldman explained this omission at the evidentiary hearing. When asked whether soot was a key part of the Commonwealth theory of guilt, he replied "It certainly wasn't, and the reason being well, simply the first point is that the witnesses we found were all over the place on that. We had witnesses—some witnesses said he was covered with soot, some said he had some soot, some said he had little soot, and some saw no soot. . . ." T.E. 3/25/03, at 38–39. Furthermore, Goldman noted that one of the Commonwealth's key witnesses, Trooper Donald Gloria, said Petitioner was covered in soot. *Id.* Given the contradictory accounts, the Commonwealth specifically refrained from using evidence of soot.

Finally, it is clear that Petitioner's son was still in the house, on the second floor, when Petitioner exited. Commonwealth's Post–Hearing Memorandum of Law at 2, *citing* T.T.s 7/22/80, at 148; 7/30/80 at 210–11; 8/1/80 at 98. Thus, the jury could have determined that Petitioner's son had greater exposure to the rising, black smoke over a longer period than did Petitioner. From this, the jury might reasonably have concluded that, regardless of how or where the fire started, Petitioner's son would have had more soot on him than his father, who was on the ground level.

Given the foregoing, the Court does not conclude that the content of the Undisclosed Statements was material to the case or that the failure to disclose them was prejudicially harmful to Petitioner. Accordingly, no writ shall issue based on the *Brady* claims.

## J. Count XIV

Count XIV alleges that, even if none of the errors cited above was sufficiently prejudicial to warrant relief, their cumulative effect requires reversal of Petitioner's conviction on grounds of ineffective assistance of counsel.[34] Because the Pennsylvania Supreme Court did not address the issue of cumulative prejudice, this Court's review is *de novo*. *Appel,* 250 F.3d at 210.

■■■ Cumulative prejudice is evaluated under the two-step process described in *Berryman v. Morton,* 100 F.3d 1089, 1101–02 (3d Cir.1996). *See Wallace v. Price,* 2002 WL 31180963 (W.D.Pa.2002). First, the Court must decide whether counsel's conduct was deficient. Here, the Court found that counsel was deficient in failing to request a limiting instruction on the use of the evidence of spousal abuse and in failing to object when Petitioner's neighbor introduced the alleged out of court statement of Petitioner's son. The second step in the *Berryman* process is to determine whether, taken together, these errors prejudiced Petitioner. The relevant standard is the same as that for individual errors.[35]

---

**34.** The Court found deficiency in trial counsel's failure to request a limiting instruction regarding spousal abuse and in his failure to object to the admission of several pieces of hearsay evidence. Although neither of these errors was sufficiently prejudicial by itself to merit the issuance of a writ of habeas corpus, the cumulative prejudice must be considered. As these errors both sound in trial counsel's deficiency, they will be evaluated under the standards for cumulative prejudice in ineffective assistance claims.

**35.** The trial's fairness is presumed and prejudice is examined in light of all the evidence presented. "In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have

This Court may not independently examine whether Petitioner is guilty. Disregarding the evidence that might not have been admitted had counsel objected, there was ample basis on which a reasonable jury could have convicted Petitioner.[36] First, it is undisputed that when the fire started, Petitioner was on the floor where it ignited. It is also clear that he was the only person on that floor at the time the fire began.

Second, even considering the evidence of abuse in light of the limiting instruction that should have been requested, that evidence does establish motive. While there is a significant difference between abuse and murder, the jury was entitled to conclude that a pattern of abuse gave rise to a motive to kill. This is particularly true when, as here, a restraining order had been entered against the abuser. At the time of his wife's death, Petitioner was living in his home and abusing his wife, both violations of the court order. Answer at 3, *citing* T.T. 7/30/80, pp. 161–72. Even absent the strong history of abuse, a reasonable trier of fact could conclude from these violations that Petitioner had a motive to kill his wife.

The physical evidence against Petitioner is significant. Of this evidence, most compelling is the presence of an empty gasoline can in the trunk of his car. In his statement to the police after the fire, Petitioner's son indicated that the family did not store gasoline in the house, either for their lawn mower or for Petitioner's business. Petitioner's Post–Hearing Memorandum of Law, Exhibit 1, at 12. The empty can had soot on it, and Petitioner's fingerprints were in the soot. Testimony established that Petitioner had tried to purchase gasoline, using the same can, the day before the fire. It cannot be said that

no reasonable juror could connect these pieces of evidence and conclude that they demonstrated arson.

Finally, several of Petitioner's statements were introduced against him. Testimony established that before the fire, Petitioner had said that if he could not get back into his house he would kill his wife, that he was going to "go home and shoot the old lady and burn the house down," that he was going to "burn the house down," that he would rather see the house burn down than let his wife have it, and that he "would sooner burn the god-damn thing down" than let his wife have it. Answer at 5–7, *citing* T.T.s 7/30/80 and 7/31/80. After his wife's death, he was said to have referred to the fire as "one of those things" and was alleged to have said that he was glad it was over and that he had a good lawyer and could get away with it. *Id.* These statements, while of limited probative value, taken together could reasonably be combined with other evidence to support the conclusion that Petitioner had a motive, had considered committing the crime, and had an emotional state consistent with the perpetrator of the crime.

In sum, even if the improperly-admitted statement by Petitioner's son is disregarded and the proof of abuse is limited to demonstrating motive, there was ample evidence from which reasonable jurors could find Petitioner guilty beyond a reasonable doubt. This Court must not weigh the evidence anew, particularly in light of the strong presumption of reliability given to a jury verdict.

In light of the weight of the evidence against Petitioner, counsel's errors, even aggregated, did not materially prejudice Petitioner's case. Given the wealth of evi-

had an isolated, trivial effect." *Id.* at 695–696, 104 S.Ct. 2052.

**36.** This is true whether one considers the evidence in light of the fire science presented at trial or in light of modern fire science.

dence introduced at trial, the Court cannot conclude that there is a reasonable likelihood that no reasonable juror would have found guilt beyond a reasonable doubt.

Accordingly, the claims asserted in Count XIV of the Petition must be denied.

## V. Claims of Error During Penalty Phase

Because the Court will grant the writ of habeas corpus on the grounds alleged in Count XI, it is unnecessary to reach the remaining penalty phase claims asserted by Petitioner.

*Count XI*

■ Count XI alleges that the sentencing instructions given to the jury were constitutionally defective because of their ambiguity with respect to whether mitigating factors must be found unanimously. In *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), the Supreme Court held that "[i]f under the sentencing scheme it is possible for jurors to agree that mitigating circumstances exist, but, because of a lack of unanimity as to which mitigating circumstances exist, to conclude that they may not consider those circumstances, the sentencing scheme is unconstitutional." *Banks v. Horn*, 271 F.3d 527 (3d Cir.2001), rev'd on other grounds, *Horn v. Banks*, 536 U.S. 266, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002) (*"Banks II"*),[37] *citing Mills*, 486 U.S. at 374, 108 S.Ct. 1860. The instructions need not express this erroneous understanding of the law of mitigating circumstances; ambiguous instructions are equally fatal. *Banks II*, 271 F.3d at 544, *citing Mills*, 486 U.S. at 375–76, 108 S.Ct. 1860 ("[T]he critical question is not whether a constitutional construction is possible, but whether a rea-

sonable jury could have interpreted the instructions in an unconstitutional manner, that is, as restricting them to finding only those mitigating circumstances as to which all can agree"). A court examining these instructions must therefore focus on the potential for or risk of jury confusion as to its role. *Banks II*, 271 F.3d at 545.

In *Banks II*, the Third Circuit examined instructions very similar to those in this case.[38] The instructions in this case provided in relevant part:

> The Crimes Code provides that the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstance or if the jury unanimously finds more aggravating circumstances which outweigh any and all mitigating circumstances. In all other cases, the verdict must be a sentence of life imprisonment.
>
> . . .
>
> Remember that your verdict must be a sentence of death if you unanimously find at least one aggravating circumstance and no mitigating circumstances or if you unanimously find one or more aggravating circumstances, and there is only one in this case, one submitted to you which outweighs any and all mitigating circumstances.
>
> In all other cases, your verdict must be a sentence of life imprisonment.

With insignificant grammatical differences, the language of the first paragraph of the instructions in this case is identical to the corresponding language of the instructions in *Banks II; Frey; Henry; Fahy v. Horn*, 2003 WL 22017231 (E.D.Pa. Aug.26, 2003); and *Kindler*. In each of these cases, the

---

**37.** The first *Banks* case, from 1997, is cited *supra* at p. 459.

**38.** The full text of the instructions found unconstitutionally ambiguous in *Banks II* and in

*Frey v. Fulcomer*, 132 F.3d 916 (3d Cir.1997), can be found in the *Banks II* opinion, 271 F.3d at 546–47.

sentence was overturned on the grounds that the quoted instruction was ambiguous and therefore violated the *Mills* rule.

"The recent decision in *Banks v. Horn* virtually compels the conclusion" that the instructions given in this case were unconstitutionally ambiguous. *Henry,* 218 F.Supp.2d. at 687, *citing Banks II.* As in *Henry,* "the precedents that the Pennsylvania Supreme Court relied on to make [the *Mills* ] determination essentially concluded that the jury instruction was constitutional because it quoted from the language in the death penalty statute." *Id.* at 687–88. By so doing, "the Pennsylvania Supreme Court ruled that there was no *Mills* violation without ever really applying the teachings of *Mills.*" *Banks II,* 271 F.3d at 545. This constitutes an unreasonable application of *Mills. Id.* As in *Henry,* "the Pennsylvania Supreme Court failed to quote any of the jury instructions." *Henry,* 218 F.Supp.2d at 688.

In its analysis in *Banks II,* the Third Circuit found two elements likely to create confusion in a juror's mind. First, it found that the jury instruction emphasized jury unanimity in close proximity to the mitigating circumstances clause. *Banks II,* 271 F.3d at 547–48 (referring to the phrase "if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstance"). Identical language was used in this case. Second, the Third Circuit found that the instructions at issue in *Banks* emphasized the difference between the relative burdens of proof for showing aggravating and mitigating circumstances but did not mention the difference in the unanimity requirements. This case also presents that problem. Petition at ¶ 195, *citing* T.T. 8/8/80 at 78–79.

To repeat, the trial court's instructions in this case were virtually identical to those in *Henry, Kindler,* and *Fahy.* In each of those cases, the death sentences were overturned on *Mills* grounds. *See*

*Henry,* 218 F.Supp.2d at 688–89; *Kindler,* 291 F.Supp.2d at 345–49; *Fahy,* 2003 WL 22017231 at *41. The Court finds that the ambiguity inherent in the instructions is sufficient to create confusion among jurors about whether unanimity was necessary to find mitigating factors. Confusion of this type renders the enhancement of a sentence unconstitutional under the rule announced in *Mills* and *Banks II.* Accordingly, the Court joins the reasoning of *Henry, Kindler,* and *Fahy* in finding the instruction in question unconstitutionally ambiguous. *See Henry,* 218 F.Supp.2d at 688–89; *Kindler,* 291 F.Supp.2d at 345–49; *Fahy,* 2003 WL 22017231 at *41.

In *Banks v. Horn,* 316 F.3d 228, 235 (3d Cir.2003) ("*Banks III* "), the Third Circuit held that *Mills* did not introduce a "new rule" for purposes of the analysis required by *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Thus, although Petitioner's conviction became final before the decision in *Mills,* the constitutional rules it announced apply retroactively to this case.

Accordingly, the Court finds that Petitioner's sentence was enhanced in an unconstitutional manner and that the enhancement must therefore be vacated.

## VI. Conclusion

The Court finds insufficient prejudicial error to support vacating Petitioner's conviction. However, the instructions given to the jury at sentencing were unconstitutionally ambiguous. Accordingly, a writ of habeas corpus shall issue, directing that Petitioner either be given a new sentencing hearing or be sentenced to life imprisonment.

### ORDER

**AND NOW,** this _____ day of April, 2004, upon consideration of the Petition for Writ of Habeas Corpus (docket no. 9) and

the responsive filings, it is **ORDERED** that:

1. Count XI of the Petition is **GRANTED** and Petitioner's sentence is **VACATED**;

2. Counts I, II, III, IV, V, VI, and VII are **DENIED** with prejudice.

3. Counts VIII, XIII, and XIV are **DENIED** with prejudice with respect to those claims which challenge Petitioner's underlying conviction and **DENIED** as moot with respect to those claims which challenge Petitioner's sentence.

4. Counts IX, X and XII are **DENIED** as moot.

5. The execution of the writ of habeas corpus is **STAYED** for 180 days from the date of this Order, during which period the Commonwealth of Pennsylvania may conduct a new sentencing hearing in a manner consistent with this Memorandum Opinion.

6. After 180 days, should the Commonwealth of Pennsylvania not have conducted a new sentencing hearing, the writ shall issue and the Commonwealth shall sentence petitioner to life imprisonment.

7. Pursuant to 28 U.S.C. § 2253, a certificate of appealability is issued with respect to those claims that were granted and those denied with prejudice.

8. If either Petitioner or Respondent files an appeal to the United States Court of Appeals for the Third Circuit, this Order will be stayed pending disposition of that appeal pursuant to Local Rule of Civil Procedure 9.4(12).